FILED

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

02 SEP 30 PH 2: 10

U.S. DISTRICT COURT
N.D. OF ALABAMA

FRANCIS HALEY; ALEX  )
KNOPFLER, as Trustee of Haley's  )
Bankruptcy Estate,  )
    )
    **Plaintiffs,**  )
    )
**vs.**  )     CV 01-B-0551-NW
    )
WHITESELL CORPORATION;  )
CITY OF MUSCLE SHOALS,  )
ALABAMA; BENJAMIN AIE  )
MONTGOMERY,  )
    )
    **Defendants.**  )

ENTERED

SEP 3 0 2002

### MEMORANDUM OPINION

    This case is currently before the court on are the motions for summary judgment, filed by defendant Whitesell Corporation [hereinafter "the Company"], (doc. 75); defendant City of Muscle Shoals, Alabama [hereinafter "the City"], (doc. 53); and defendant Benjamin Aie Montgomery, (doc. 85). On or about March 2, 2001, plaintiff Francis Haley filed suit against the Company, his former employer, and the City, claiming they unlawfully had detained him in violation of federal and state law. He also alleged that the Company had terminated him on the basis of his age and that it had defrauded him. Thereafter, on March 12, 2002, plaintiff amended his complaint, reasserting his claims against the Company and the City, as well as adding claims against Montgomery. Plaintiff alleged that Montgomery, as an agent of the City and of the Company, unlawfully detained him in violation of federal and state law.



The parties have fully briefed the motions for summary judgment and the court heard oral argument.  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that the motions for summary judgment are due to be granted and plaintiff's claims are due to be dismissed.

## I. <u>FACTUAL SUMMARY</u>[1]

Plaintiff, who was born in 1948, worked as a journeyman electrician and foreman in the Chicago, Illinois area between 1978 and 1996.  (Doc. 82, Exh. H ¶¶ 1, 3.)  Thereafter, plaintiff operated an insurance agency until he sold it in the summer of 1998.  (*Id.* ¶ 4; doc. 76, Exh. 1 at 43-44.)

While working as an electrician, plaintiff met Dave Trendler.  Neil Whitesell, the Company's owner and president, had hired Trendler for an allegedly short-term assignment recruiting a manufacturing management team for the Company.  (Doc. 76, Exh. 4 at 36; Exh. 2 ¶ 3.)  During the fall of 1998, plaintiff and Trendler discussed a sales position with the Company.  (Doc. 76, Exh. 1 at 83-84.)  Two weeks after his initial discussion with Trendler, plaintiff called Trendler and, again, asked about a sales job with the Company.  (Doc. 76, Exh. 1 at 84.)  Trendler told plaintiff that, while there were no sales jobs available, the Company was looking for a maintenance manager, a job for which he thought plaintiff was qualified.  (*Id.* at 85-87.)  Plaintiff then visited the Company's facility in Muscle Shoals,

---

[1]Although some statements of fact are disputed, the evidence is cited in the light most favorable to plaintiffs, the non-moving parties, and all reasonable inferences from admissible evidence are drawn in favor of plaintiffs. *See e.g., Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000).

Alabama. (*Id.* at 89-90.) Prior to this visit, the only person from the Company with whom plaintiff had spoken was Trendler. (*Id.*) Trendler gave plaintiff a tour of the plant and told him that some of the job duties were organization of the equipment, eliminating downtime on machines, and making the maintenance crew more efficient. (*Id.* at 90-94.) No one offered plaintiff a job during this visit. (*Id.* at 107.) A couple of weeks later, plaintiff informed Trendler that he was interested in the maintenance manager job, although his goal was to become a salesperson. (*Id.* at 109, 122-24.)

Trendler told plaintiff that the typical pay for a maintenance manager job was $45,000 annually. (*Id.* at 110.) Considering that he would have to move from Illinois to Alabama, plaintiff told Trendler that he would not work for less than $100,000 annually. (*Id.* at 111-13.) Trendler offered plaintiff an annual salary of $70,000, and promised him a bonus, contingent on his "excellent" performance, which would bring him up to $100,000. (Doc. 76 at 115, 119.)

On November 10, 1998, plaintiff began working for the Company as Facilities Manager and Maintenance Supervisor, at an annual salary of $70,000. (Doc. 76, Exh. 1 at 147; doc. 82, Exh. H ¶ 5.) The other members of the "management team" Trendler had hired were Steve Shulenburg (54), Plant Manager; Mark Vesick (34), Threading Manager; and Jeff Chambers (31), Heading Manager. (Doc. 76, Exh. 2 ¶ 2.) Plaintiff reported to Trendler and Shulenburg. (Doc. 76, Exh. 1 at 149-50.)

Plaintiff testified that he believed that the job was permanent and that he would not have accepted the job if he had believed it was a temporary assignment. (Doc. 82, Exh. H

¶ 5.) He testified that he and his wife wanted to move to Muscle Shoals and he had joined a church in the area. (*Id.* ¶ 15.)

During the time he worked for the Company, plaintiff went home to Illinois approximately twice a month. (Doc. 76, Exh. 1 at 16.) According to plaintiff, Trendler told him that the Company would pay for his trips home every other weekend. (*Id.* at 285.) After about a month, the Company paid for only half of his trips home. (*Id.* at 287-88.) Plaintiff did not think this payment system was unfair and was content with this pay arrangement. (*Id.*)

Suzanne Serrano, Director of Human Resources, and Amy Gargis, Executive Assistant to Whitesell, testified that they had observed plaintiff become angry at work. (Doc. 76, Exh. 3 at 49;[2] Doc. 76, Exh. 5 at 12-13.[3]) In his Supplemental Affidavit, plaintiff admits that he had some "less than pleasant interactions with other employees, but on each occasion, it was [the other] employee who was the antagonist." (Doc. 82, Exh. H ¶ 8.) However, he never got into a "physical altercation." (*Id.*) The evidence does not support a finding that plaintiff was actually violent or that he had exhibited any violent tendencies.

---

[2]Serrano testified that she observed plaintiff become angry when he came to her asking why he has not been paid for time he had taken off. She testified that when plaintiff became angry his face was red and his "facial expressions" changed. After Serrano explained why plaintiff's pay had been cut, "he got mad and walked out of my office." (Doc. 76, Exh. 3 at 49-50.)

[3]Gargis testified, "Mr. Haley . . . whined and complained quite a bit, and he would lose his temper over small things, but to name a particular instance, I'm not able to do that." (Doc. 76, Exh. 5 at 13. She also testified that he was "not violent, just very jittery [and] loud. [He would] throw up his hands and kind of walk out . . . disgusted." (*Id.*)

Plaintiff enjoyed his job at the Company.  He testified that he worked twelve hours a day Monday through Friday, and that he worked six hours on Saturdays, and four hours on Sunday. (*Id.* ¶ 6.)  In January 1999 and in September 1999 (one week before he was fired), Whitesell told plaintiff he was doing a "great job." (*Id.* ¶ 9.)  Also, Trendler generally commended plaintiff's job performance. (*See* doc. 76, Exh. 1 at 153-57.)  However, plaintiff testified that, in the Spring of 1999, Shulenburg had told plaintiff he needed to monitor employees' overtime hours more closely, and Whitesell had told plaintiff that he needed to fire a particular employee and that he needed to stop hiring people. (*Id.* at 157-58.; doc. 82, Exh. H ¶ 9.)

The Company contends that Trendler had misrepresented plaintiff's background at the time it hired plaintiff. (Doc. 76, Exh. 4 at 47.)  Whitesell testified:

> When [plaintiff] came in, he had no experience whatsoever in working with equipment of our type.  He had no experience ever having been a facilities manager before, and Mr. Trendler represented him as someone that was a highly qualified facilities manager that could do anything and everything we needed.  As it turned out, he had no prior background doing such, and it reflected in the performance we found.

(*Id.*)  Both Whitesell and Robert Wiese, Chief Operating Officer, were concerned about Trendler's ability to hire qualified members of the management team after they learned that Trendler had hired plaintiff, his personal friend. (Doc. 76, Exh. 6 at 18-19.)

Whitesell decided that the members of Trendler's management team "were totally unqualified to do the jobs they were hired to do" and that they were unable to perform their jobs. (Doc. 76, Exh. 4 at 16.)  In particular, Whitesell considered plaintiff's job performance

5

poor based on a "variety of factors," including: "excessive amount of downtime of equipment for maintenance reasons, increased staffing of the department with no improvement in the production downtime in the equipment, [and an] excessive amount of overtime in the department." (*Id*. at 4.)

Whitesell reviewed the weekly payroll report to learn that staffing and overtime pay had increased in the maintenance department. (*Id*. at 6.)  As the owner and president of the Company, Whitesell was aware of the historical daily and weekly payroll expenses, and he was able to discern when such expenses were above the normal range. (*Id*. at 8.)

Whitesell received daily production reports, which reflected the production weight per machine, the number of hours each machine operated, the number of hours of downtime for each machine, and the reason for the downtime. (*Id*. at 5.)  During plaintiff's employment, the Company had more machines down than at any other time during the sixteen-year history of the Company. (*Id*. at 17.)  Whitesell determined that the "primary cause of the downtime was . . . overall mismanagement by this [management] team that Mr. Trendler had hired." (*Id*. at 50-51.)  He stated:

> Any department must have a good manager to lead and direct his people.  A mechanic will go do what he's told to do, but a manager must look at it and assess the problem and tell him what he wants done and fix it.  That's what the absence was here; there was no one giving people direction and guidance, and so if they weren't being told to do something, they didn't do it.  . . .
>
> . . .
>
> Mr. Haley had no experience or knowledge whatsoever on our equipment, so he was not qualified to give them direction.

6

(*Id*. at 52.)  Also, Gargis observed that plaintiff was not performing his job duties; she reported this to Whitesell. (Doc. 76, Exh. 5 at 11.)

Whitesell talked to a number of experienced machine operators about problems with machine downtime; the general consensus among these employees was that the management team had no idea how to perform their job duties. (Doc. 76, Exh. 4 at 23-24, 41, 45.) Kenny Rogers, a key machine operator, told Whitesell that plaintiff sat in his office and that the employees never saw him.  (*Id*. at 45-46.)  Rogers also told Whitesell that the management team treated employees "abusively, cussing them, treating them like they're dirt." (*Id*. at 46.)

Whitesell, Wiese, and Serrano made the decision to terminate the management team based on poor job performance.  (Doc. 76, Exh. 4 at 4; Exh. 3 at 11-12.)  At that time Whitesell was 35, Wiese was 53, and Serrano was 36.  These three held a meeting in which they discussed production downtime and machine downtime, overall inefficiency, the rise in overtime, and low morale at the plant. (Doc. 76, Exh. 3 at 6.)  The decision to terminate the management team was based on their determination "that the group had clear deficiencies and . . . that they had not completed what they were supposed to do."  (*Id*. at 12.)  All three considered the performance of the individual team members and the team as a whole when deciding to terminate the team members.  (Doc. 76, Exh. 4 at 22.)

After making the decision to terminate the management team, Whitesell requested security services for the entire day of terminations "because Mr. Trendler had told [him] on more than one occasion that Mr. Shulenburg and [plaintiff] had violent tempers." (*Id*. at 70.) Serrano contacted the City's police department, and a detective told her "that he did have

officers that did security work off duty. (Doc. 76, Exh. 3 at 21.) The detective told Serrano that he would contact such officers and someone would call her back. (*Id.*)

Benjamin Montgomery, a City police officer, called Serrano, and she told him to meet her between 8:00 a.m. and 8:30 a.m. at the Company on the day of the terminations. (*Id.* at 21-23.) She did not discuss with Montgomery what he would wear and/or whether he would be armed. (*Id.*)

In addition to arranging for security, the Company also made flight arrangements for plaintiff and the other members of the management team that lived out of town. (Doc. 76, Exh. 5 at 53-55.) Gargis selected an 11:00 a.m. flight for plaintiff because plaintiff had previously chosen this flight when he had flown home and because the other flight times were 6:00 a.m and 6:30 p.m. (*Id.* at 53-54.)

On September 10, 1999, the five members of the management team – Trendler (56), plaintiff (50), Shulenburg (54), Vesick (35), and Chambers (32) – were terminated for poor performance. (Doc. 76, Exh. 2 ¶ 2.) On that day, Gargis collected each management team member's personal belongings, placed the belongings in a box, and the boxes were taken to the lobby. (Doc. 76, Exh. 5 at 23.) Also, Serrano explained to Montgomery that Whitesell would be terminating the employment of certain employees, and she identified plaintiff and Shulenburg as "two people . . . that [she] had heard could possibly become angry and violent." (Doc. 76, Exh. 3 at 70.) She told Montgomery that, if "it got out of hand," she wanted Montgomery "to be availble to assist us in taking care of that issue as best we could." (*Id.*) Montgomery was not on duty as a City police officer at this time, and the Company

8

paid him $18 per hour for his services. (Doc. 76, Exh. 7 at 38.)  September 10, 1999, was the only day that Montgomery worked for Whitesell. (Doc. 53, Exh. 12 at 25.)

On the morning of September 10, 1999, around 9:30 a.m., plaintiff learned that Serrano was looking for him. (Doc. 76, Exh. 1 at 191.)  He found Serrano seated in a conference room with Tom Collins, Chief Financial Officer. (*Id.* at 192, 194.)  Serrano asked plaintiff for his keys and gave him a letter, which stated, "Effective immediately, your services are no longer required.  We are sorry that your success here did not live up to our mutual expectations." (*Id.* at 192, 290, & exh. 6.)  Plaintiff testified that he was shocked because, just the previous week, Whitesell had told plaintiff's wife that plaintiff was doing "a great job."[4]  (*Id.* at 153.)

Then, Serrano gave plaintiff an airline ticket for the 11:00 a.m. flight to Chicago. (*Id.* at 193-94.)  At this time, it was 10:00 a.m. (*Id.* at 194.)  Plaintiff took the ticket and told Serrano that he could not possibly make that flight because he had errands to run, such as going to the bank, the dry cleaners, and the post office, and because he wanted to say good-bye to his priest and his friends in Muscle Shoals. (*Id.* at 194, 290.)  According to plaintiff, Serrano said, "You're going to make that flight." (*Id.* at 290.)  At this point, Montgomery came into the room and stood beside plaintiff. (*Id.*)  Montgomery told plaintiff that they were going to his house and to the airport. (*Id.* at 263.)

_____

[4]Plaintiff's wife had talked to Whitesell while she was visiting her husband over the Labor Day weekend, during which time, they were looking for a house in Muscle Shoals. (Doc. 82, Exh. E ¶ 3.)

9

Plaintiff understood that Montgomery was a police officer because he was wearing a shirt that said "Muscle Shoals Police Department,"[5] and he was carrying a gun and a pair of handcuffs. (*Id.* at 263-64.)

Plaintiff went to the lobby and picked up the box containing his personal belongings. At this point, he discovered that some personal items were not in the box. (Doc. 76, Exh. 1 at 291.) Plaintiff said that he was not leaving until he got his personal items, and he waited in the lobby while someone went to look for them. (*Id.* at 304-05.) All of the missing personal items were not found and plaintiff was not allowed to return to his office to search his desk.

The doors to the Company's front lobby were unlocked while plaintiff waited, and no one told him that he could not leave. (*Id.* at 305-06.) Montgomery repeatedly said, "Let's go," and he told plaintiff that the Company would send his missing personal items to him later. (*Id.* at 293.) When some of plaintiff's personal items were found,[6] plaintiff agreed to leave. (*Id.* at 292.) It was approximately 10:15 a.m. (*Id.* at 267.)

Serrano asked plaintiff if he wanted to go to his house to get his personal items and plaintiff said, "Yes." (Doc. 82, Exh. B at 33.) Montgomery, with Serrano and Gargis, walked with plaintiff to the company-owned car that he had been driving. (Doc. 82, Exh. A

---

[5]Montgomery purchased this shirt; it was not provided by the City. However, he testified that off-duty police officers wear such a shirt "when we go to part-time work to show who we are." (Doc. 76, Exh. 7 at 30.)

[6]Plaintiff contends that certain "precious mementos" of great sentimental value were never returned to him; these include "[his] father's rosary and missal, pictures of [his] father and brother, and letters from [his] brother." (Doc. 82, Exh. H ¶ 16.)

at 198-99.) Montgomery drove them to the Company's house where plaintiff had been living with other Company employees while in Muscle Shoals. (Doc. 82, Exh. B at 34-37.) Plaintiff rode in the front seat with Montgomery, and Serrano and Gargis rode in the back seat. (Doc. 82, Exh. A at 198-199.) At the house, plaintiff walked upstairs, followed by Montgomery, to retrieve his belongings. (*Id*. at 200.)   Plaintiff claims that Montgomery stated, "Let's go," and, "They'll send you the rest." (*Id*. at 269-70.) Also, plaintiff asked Montgomery if he could use the restroom, and Montgomery instructed him to leave the restroom door open. (*Id*. at 269.)

While at the Company's house, plaintiff identified his belongings and Serrano agreed to mail these belongings to him. (Doc. 76, Exh. 3 at 37, 39.) The total time the four remained at the Company's house was approximately fifteen minutes, and, during this time, no one touched plaintiff or informed him that he was not allowed to leave. (Doc. 76, Exh. 1 at 202.)

After leaving the Company's house, plaintiff asked to stop at the post office. (*Id*.) The group stopped at the post office; plaintiff got out and got his mail. (*Id*. at 203.) No one else got out of the car at the post office. (*Id*.) Plaintiff got back into the car and gave his mail box key to Serrano or Gargis and asked them to forward his mail. (*Id*. at 207-08.) They agreed.

After the stop at the post office, plaintiff, Montgomery, Serrano, and Gargis went to the airport. (*Id*. at 203.)   At the airport, everyone got out of the car, but only plaintiff and Montgomery went into the airport. (*Id*. at 203-04.) Plaintiff went by himself to the ticket

11

counter to check in and then to the gate.  (*Id*. at 205-06.)  Montgomery was about ten feet behind plaintiff at the counter and plaintiff did not look behind him to see if Montgomery followed him to the gate.  (*Id*.)  Plaintiff waited approximately five minutes to board the plane. and, during that time, he did not see Montgomery.  (*Id*. at 273.)

Montgomery testified that he considered it plaintiff's personal business to decide whether to get on the airplane and that he would not have taken action if plaintiff had refused to get on the plane.  (Doc. 76, Exh. 7 at 51, 83.)  Montgomery did not touch plaintiff, handcuff him, and/or put him in a police car.  (Doc. 76, Exh. 1 at 275-76.)  No one told plaintiff he had to leave Muscle Shoals.  (*Id*. at 207.)

Matt Hill (26 or 27) assumed plaintiff's job duties.  (*Id*. at 295; doc. 76, Exh. 4 at 26.)  Hill has cut costs and machine downtime while serving as Facilities Manager.  (Doc. 76, Exh. 4 at 29.)  Whitesell testified that Hill's performance has been "outstanding" and that plaintiff's performance was substandard.  (*Id*.)

Plaintiff filed a charge of discrimination with the EEOC on March 7, 2000.  (Doc. 76, Exh. 1, exh. 2.)  Plaintiff filed a second EEOC charge on March 9, 2000.  (Doc. 76, Exh. 1, exh. 3.)  Both charges allege that the Company terminated plaintiff on the basis of his age.

On July 31, 2000, Cynthia Pierre, District Director of the Birmingham District of the EEOC, issued a determination letter that states:

> I have determined that the evidence obtained in the investigation establishes reasonable cause to believe that the Respondent discriminated against Charging Party in violation of the Age Discrimination in Employment Act by discharging him because of his age (51).  Respondent denies the allegations.

> Evidence of record indicates that the reasons Respondent gave for discharging
> Charging Party were not true.

(Doc. 82, Exh. P.)  The EEOC's attempt to conciliate this matter were unsuccessful and it

issued plaintiff a right to sue letter on December 4, 2000.  Thereafter, plaintiff filed the

instant action.

## II. **SUMMARY JUDGMENT STANDARD**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record

shows "that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the

initial burden of showing no genuine issue of material fact and that he is entitled to judgment

as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see*

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met his

burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that

there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S.

317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the

drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the

non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

### A.   STATUTE OF LIMITATIONS – CLAIMS AGAINST MONTGOMERY

Montgomery contends that plaintiff's claims against him are due to be dismissed as time-barred. The acts complained of by the plaintiff in all of his claims against defendant Montgomery occurred on September 10, 1999. Montgomery was not named as a defendant in plaintiff's original complaint, filed on March 2, 2001. On March 12, 2002, plaintiff filed an amended complaint, naming Montgomery as a defendant and alleging that he had unlawfully detained plaintiff in violation of state and federal law. (Doc. 66.)

The statute of limitations for plaintiff's federal claims based on unlawful detention is two years from the date of the unlawful detention. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)("We . . . hold that where state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions." (citing, *inter alia*, Ala. Code § 6-2- 38(1))). The statute of limitations for his state law claims based on unlawful detention, or false imprisonment is six years. Ala. Code § 6-2-34(1) ("The following must be commenced within six years: (1) Actions for any trespass to person or liberty, such as false imprisonment.").

14

The court finds that plaintiff's state-law claim for false imprisonment against Montgomery is not time-barred. Plaintiff does not oppose Montgomery's motion for summary judgment as to his § 1983 claims asserted against Montgomery.

Therefore, Montgomery's motion to dismiss plaintiff's claims as time-barred is due to be granted as to his § 1983 claims and denied as to his state-law false imprisonment claim.

## B. ADEA CLAIM – THE COMPANY

### 1. Plaintiff's Motion to Strike

Plaintiff filed a motion to strike the Company's supplemental evidentiary submission, which consists of the testimony of Cynthia Pierre, District Director of the Birmingham District Office of the EEOC, given during a hearing on an internal discrimination complaint. Plaintiff contends that this transcript is "inaccurate" and that the transcript is "a confidential document which was illegally disclosed." (Doc. 89.) Although the court is concerned with certain statements made by Pierre contained in the transcript, this evidence is irrelevant to the determination of plaintiff's ADEA claim against the Company. Therefore, the motion to strike will be granted on the basis that Ms. Pierre's testimony is not relevant.

### 2. Plaintiff's Termination Claim

Pursuant to the Age Discrimination in Employment Act, the ADEA, it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). "When a plaintiff alleges disparate treatment, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision. That is, the plaintiff's age must have actually played a role in the employer's decisionmaking process

and had a determinative influence on the outcome." *Chapman v. AI Transport*, 229 F.3d

1012, 1024 (11th Cir. 2000)(quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S.

133, 141 (2000)(quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993))) (internal

citations and quotations omitted).

In order to prevail on a claim under the ADEA, 29 U.S.C. § 621, plaintiff must first

make a *prima facie* showing of age discrimination, which requires him to show: "(1) that [he]

was a member of the protected group of persons between the ages of forty and seventy; (2)

that [he] was subject to adverse employment action; (3) that a substantially younger person

filled the position . . . from which [he] was discharged; and (4) that [he] was qualified to do

the job for which [he] was rejected. *Damon v. Fleming Supermarkets of Florida*, 196 F.3d

1354, 1359 (11th Cir. 1999)(citing *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432

(11th Cir.1998)). "Once a prima facie case is established, a defendant must proffer

legitimate, nondiscriminatory reasons for its employment decision. If such reasons are

identified, a plaintiff then bears the ultimate burden of proving them to be a pretext for age

discrimination." *Id*. at 1361 (citing *Turlington*, 135 F.3d at 1432).

From the undisputed facts on record, the court is satisfied that plaintiff has established

the a prima facie case of age discrimination with regard to his termination.[7] However, the

_____

[7]The Company contends that plaintiff cannot establish a prima facie case of discrimination because he cannot establish that he was qualified for his job. Whitesell's Brief in Support of its Motion for Summary Judgment, pp. 15-16. However, the Eleventh Circuit has held that, generally, "qualification for the position" is not an element of a prima facie case with regard to a termination. *See Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1360 (11th Cir. 1999); *Pace v. Southern Railway System*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983).

16

court finds that plaintiff failed to demonstrate that the Company's articulated legitimate, nondiscriminatory reasons for his termination are pretext for age discrimination.

The Company contends that it terminated plaintiff, along with all other members of the management team, because of poor performance.  Therefore:

> the presumption of discrimination is eliminated and "the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.

*Chapman* , 229 F.3d at 1024-25 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528-29 (11th Cir. 1997))(internal citations and quotations omitted).  Plaintiff may establish that an articulated reason is a pretext for age discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989)(quoting *Goldstein v. Manhattan Industries*, 758 F.2d 1435, 1445 (11th Cir. 1985)(citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981))).  If a plaintiff chooses to establish pretext by showing that his employer's proffered reason is unworthy of credence, he must attack that reason "head on and rebut it."  *Chapman*, 229 F.3d at 1030.  The plaintiff must offer evidence that "casts sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not

what actually motivated its conduct.'" *Combs*, 106 F.3d at 1538(quoting *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).

In this case, the Company has offered two reasons for plaintiff's termination: (1) his poor performance, and (2) his membership on the management team, which the Company decided to terminate – en masse – for poor performance. Plaintiff has presented some evidence regarding whether his individual performance was deficient and whether Whitesell, in particular, regarded his individual performance as deficient.[8] However, he has not presented any evidence to show that his termination as part of the "team" was a pretext for unlawful age discrimination.[9]

In deciding the Company's motion for summary judgment on plaintiff's ADEA claim, the court has considered the cause finding of the EEOC. Although the EEOC found that "[e]vidence of record indicates that the reasons [the Company] gave for discharging [plaintiff] were not true," this finding is not supported by explanation or evidence. Therefore, the court finds that the cause finding is of no evidentiary value. *See Barfield v. Orange County*, 911 F.2d 644, (11th Cir. 1990), *cert. denied* 500 U.S. 954 (1991); *see also Lee v. Executive Airlines, Inc.*, 31 F. Supp. 2d 1355, 1357 (S.D. Fla. 1998)("Absent providing any details or otherwise describe 'the evidence' relied upon, the Letter of

———————————————

[8]There is insufficient evidence of pretext as to each and every reason offered by defendant as to plaintiff's individual performance. *See Chapman*, 229 F.3d at 1024-25.

[9]Plaintiff did not address this reason – the termination of the team – in his brief in opposition to the Company's motion for summary judgment. *See* Plaintiff's Brief in Opposition to the Company's Motion for Summary Judgment, pp; 11-20.

18

Determination possesses minimal probative value." (citing *Johnson v. Yellow Freight System, Inc.*, 734 F.2d 1304 (8th Cir. 1984))).

Based on the reasons set forth above, the court finds that the company's motion for summary judgment as to plaintiff's age discrimination claim is due to be granted.

## C.    FRAUD CLAIM – THE COMPANY

Plaintiff claims that the Company is liable for fraud and suppression of a material fact based on its alleged representation to plaintiff that he "would receive a bonus if he performed excellently." Plaintiff's Brief in Opposition to Company's Motion for Summary Judgment, p. 20. Plaintiff's claim of fraud is based on the Company's promise that it would perform in the future.

> The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation. To prevail on a promissory fraud claim such as that at issue here, that is, one based upon a promise to act or not to act in the future, two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive. Furthermore, the failure to perform a promised act is not in itself evidence of intent to deceive at the time a promise is made. If it were, the mere breach of a contract would be tantamount to fraud.

*Padgett v. Hughes*, 535 So.2d 140, 142 (Ala. 1988)(citing *Russellville Production Credit Ass'n v. Frost*, 484 So.2d at 1085-87 (Ala. 1986)).

Plaintiff contends that the evidence demonstrates that Whitesell was dissatisfied with Trendler's performance at the time plaintiff was hired; therefore, a jury could infer that, at the time plaintiff was hired, the Company had no intention of keeping plaintiff employed

long enough to receive his promised bonus. Plaintiff's Brief in Opposition to Company's Motion for Summary Judgment, p. 20-21. This argument is a *non sequitur*. *Whitesell* did not make any promise or representation to plaintiff regarding his bonus, his tenure, or Trendler's tenure with the Company. Trendler promised plaintiff a performance bonus, and nothing in the record indicates that Trendler did not intend to keep this promise. The fact that Trendler made the promise of a bonus to plaintiff unaware of the tenuous nature of his continued employment is not evidence that Trendler did not intend for the Company to pay a performance bonus or that he intended to deceive plaintiff at the time he promised him a performance bonus. Because plaintiff has not produced sufficient evidence to demonstrate the required elements of his promissory fraud claim, the court finds that the Company's motion for summary judgment is due to be granted as to plaintiff's fraud claim.[10]

## D.    FALSE IMPRISONMENT CLAIM – THE COMPANY & MONTGOMERY

Plaintiff alleges that the Company and Montgomery "unlawfully detained" him on September 10, 1999, following his termination. Under Alabama law, false imprisonment is "the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." Ala. Code. § 6-5-170. "For there to be a false imprisonment, there must be some direct restraint of the person . . . . Any exercise of force,

---

[10]Plaintiff's complaint also contains a claim based on alleged fraud related to the payment of his expenses for trips to his home in Chicago. However, plaintiff has abandoned this claim. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994)(A district court can "properly treat as abandoned" a claim alleged in the complaint but not discussed on summary judgment.).

or the express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment." *Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1001 (Ala. 1993). "At minimum, a plaintiff must request or attempt to leave the confined area." *Johnson v. Federal Express Corp.*, 147 F. Supp. 2d 1268, 1277 (M.D. Ala. 2001)(citing *Williams v. Wal-Mart Stores, Inc.*, No. Civ. 99-1032-AH-C, 2000 WL 1367977 at *3 (S.D. Ala. Sept. 5, 2000); *Uphaus v. Charter Hosp. of Mobile*, 582 So.2d 1140, 1142 (Ala. Civ. App. 1991)).

Plaintiff contends that "Montgomery's demeanor created a reasonable apprehension in [his] mind that if he did not cooperate with Whitesell and get on the plane out of Muscle Shoals, Officer Montgomery would use force." (Pl.'s Br. in Opp. to the Company's Mot. for Summ. J., p. 22.) The record contains no evidence of a direct threat of force. Moreover, the record demonstrates that no one told plaintiff that he could not leave – or that he had to leave with Montgomery – at any time between when he was fired until he boarded the airplane to Chicago. Also, plaintiff never tried to leave and he never asked to leave. The court finds that the evidence, viewed in this light most favorable to plaintiff, does not establish that Montgomery's conduct constituted an "implied threat of force."

Thus, the court finds that the Company and Montgomery are entitled to summary judgment as to plaintiff's false imprisonment claim.

21

E.   **PLAINTIFF'S SECTION 1983 CLAIMS BASED ON ALLEGED FALSE IMPRISONMENT – THE COMPANY AND THE CITY.**

Plaintiff alleges a § 1983 claim, based on the Fourteenth Amendment, against the Company and the City. These claims are based on his allegations that these defendants, through their agent, Montgomery, unlawfully detained plaintiff on September 10, 1999. To establish a § 1983 claim based on allegedly unlawful detention, a plaintiff "must meet the elements of common law false imprisonment and establish that the imprisonment resulted in a violation of due process rights under the Fourteenth Amendment." *Ortega v. Christian*, 85 F.3d 1521, 1526 (11th Cir. 1996)(citing *Cannon v. Macon County*, 1 F.3d 1558, 1562-63 (11th Cir. 1993)). The court's determination, *supra*, that plaintiff has failed to establish his common-law false imprisonment claim compels dismissal of his § 1983 claims based upon the same facts.

Therefore, the court finds that the motions for summary judgment, filed by the Company and the City as to plaintiff's § 1983 claims against these defendants are due to be granted.

## VI. CONCLUSION

For all of the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendants are entitled to judgment as a matter of law on all of plaintiff's claims. An order granting defendants' motions for summary judgment (docs. 53, 75 & 85), as well as granting plaintiff's motion to strike the Company's supplemental evidentiary submission (doc. 89), will be entered contemporaneously with this Memorandum Opinion.

22

**DONE** this _30th_ day of September, 2002.

*Sharon Lovelace Blackburn*

**SHARON LOVELACE BLACKBURN**
United States District Judge